1

Laurie Elizabeth Alderman
473 Maple Avenue

2

Cotati, CA 94931
707-795-1540

3

lauriealderman@yahoo.com

4

*Pro Se – Plaintiff*

5

6

**UNITED STATES DISTRICT COURT**

7

**NORTHERN DISTRICT OF CALIFORNIA**

8

*Oakland*

9

Laurie Elizabeth Alderman

10

Plaintiff,

11

vs.

12

13

City of Cotati,
Michael Parish, Mark Landman, John Moore,

14

John DellOsso, Wendy Skillman, Damien
O'Bid

15

16

Defendants

17

| | |
|---|---|
| Case Number:  4:19-cv-05844 | |
| | |
| AMENDED COMPLAINT FOR: | |
| | |
| --Violation of Civil Rights | |
| --ADA discrimination | |
| --Monell Claim | |

18

On 2/4/2020, U.S. Magistrate Kandis A. Westmore through her order granting in part and denying

19

in part Defendants' Motion to Dismiss, ordered that I (a pro se plaintiff) may file an amended

20

complaint consistent her order.   This is the amended complaint.  Also granted was an extension

21

of the due date of this amended complaint to 3/16/2020.

22

Plaintiff Laurie Alderman, by and through acting as her own attorney (pro se), herby brings this

23

action under 42 U. S. C. §1983 and common law against defendants:  CITY OF COTATI, POLICE

24

CHIEF MICHAEL PARISH, CITY COUNCIL MEMBER MARK LANDMAN, CITY

25

COUNCIL MEMBER JOHN MOORE, CITY COUNCIL MEMBER JOHN DELLOSSO, CITY

26

COUNCIL MEMBER WENDY SKILLMAN AND CITY MANAGER DAMIEN O'BID.

27

28

AMENDED COMPLAINT

## JURISDICTION AND VENUE

1.  This action is brought under 42 U.S.C § § 1982 and 1988.   Jurisdiction is conferred on this Court by 28 U.S.C. § § 1331 and 1343, this being an action seeking redress for the violation of plaintiff's constitutional and civil rights.

2.   Plaintiff further invokes this Court's supplemental jurisdiction under 28 USC §1367, and any and all state law claims and as against all parties so related to claim in this action with this Court's original jurisdiction that they form part of the same case or controversy.

3.   Venue in this district is proper in the Northern District of California under 28 U.S.C. §1391(b) and (c) in that the defendant City of Cotati is administratively located within this district, and the events giving rise to this claim are within the Northern District.

4.    Plaintiff seeks relief under the Civil Rights Act of 1871, as amended codified in 42 U.S.C § 1983, for violation of her First Amendment rights secured by the United States Constitution and by the laws and Constitution of the State of California.

5.    Plaintiff seeks relief under the same Civil Rights Act of 1871, for violations of the 14th Amendment, most notably the 14th Amendment's equal protection under the law clause concerning her rights to equal police protection, code enforcement and property rights as other citizens of the City of Cotati, of the State of California, and of the United States of America.

6.    Plaintiff seeks additionally relief against the defendant, CITY OF COTATI under the Americans with Disabilities Act of 1990, Title II, which applies to public entities.

7.    Plaintiff seeks compensatory and exemplary damages, injunctive relief, an award of costs, and such other and further relief as this Courts deems just and proper.

## PARTIES

8.  Plaintiff LAURIE ALDERMAN is, and at all times mentioned in this complaint was a citizen of the United States, residing in the City of Cotati, County of Sonoma, State of California.

9.   At all relevant times, defendant CITY OF COTATI was a municipal entity created and authorized under the laws of the State of California.   It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement.

AMENDED COMPLAINT

10.   Defendant CITY OF COTATI was at all relevant times, the public employer of the defendants MICHAEL PARISH, MARK LANDMAN, JOHN MOORE, JOHN DELLOSSO, WENDY SKILLMAN and DAMIEN O'BID.

11.   At all relevant times, defendant MICHAEL PARISH was a duly appointed and acting officer, servant, employee, and agent of the City of Cotati Police Department, a municipal agency of the defendant CITY OF COTATI.   Chief Parish attends the great majority of the city's council meetings, fully armed and dressed in uniform.   Chief Parish has been continuously employed in this position since 2012.

12.   At all relevant times, the defendants, MARK LANDMAN, JOHN MOORE, JOHN DELLOSSO and WENDY SKILLMAN were duly elected and acting as servants, employees and agents of the City of Cotati.   All of these four council members have continually been in office since at least the 2014 election year.

13.   At all relevant times, defendant DAMIEN O'BID, was a duly appointed and acting servant, employee and agent of the City of Cotati.   The defendant has been in his current title as city manager since 2014, and before that, was employed as the city engineer since 2008.

14.   At all relevant times, defendant Michael Parish was acting under the colors of the laws, statutes, ordinances, regulations, policies, customs, and/or usages of the State of California and Cotati Police Department, in the course and scope of his duties and function as an officer, agent, servant, and employee of defendant CITY OF COTATI, was acting for, and on behalf of, and with the power and authority vested in him by the City of Cotati and the Cotati Police Department, and was otherwise performing and engaging in conduct incidental to the performance of his lawful functions in the course of his duties.   He is sued in his individual and official capacities.

15.   At all relevant times, defendants MARK LANDMAN, JOHN MOORE, JOHN DELLOSSO, WENDY SKILLMAN AND DAMIEN O'BID were acting under the color of the laws, statutes, ordinances, regulations, policies, customs, and/or usages of the State of California and the City of Cotati, in the course of their duties and functions as officers, agents, and employees of the defendant CITY OF COTATI, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.   Therefore, defendants

AMENDED COMPLAINT

1  MARK LANDMAN, JOHN MOORE, JOHN DELLOSSO, WENDY SKILLMAN and DAMIEN

2  O'BID, are all sued in their individual and official capacities in the civil rights claim.

### NOTICE OF CLAIM

16.  Plaintiff LAURIE ALDERMAN timely filed two government tort claims with the City of

Cotati on May 28th, 2019 and June 3rd, 2019, setting forth the facts underlying plaintiff's claim and

the City of Cotati and all defendants mentioned, including the city council members and city staff

mentioned herein.

17.  The City of Cotati rejected both of the plaintiff's claims on June 24, 2019, and no

compensation has been offered by the defendant CITY OF COTATI in response to plaintiff's

claims.

18.  This action had commenced within six months of the service of the rejection of the plaintiff's

claim.   The original complaint was filed on September 19, 2019.   U.S. Magistrate Judge

Westmore's order allowing for this amended complaint was filed 2/4/2020.   A motion to extend

the due date of this amended complaint was granted, allowing to 3/16/2020 for the amended

complaint to be filed.

### FACTS AND BACKGROUND SECTIONS

19.    In the facts and background sections, as a pro se litigant, I will be writing in first person

voice.

20.   The City of Cotati and the mentioned individual defendants, for at least five years, have

chilled my free speech rights, denied me equal protection under the laws of the city, and targeted

their behavior against my known disabilities for the City's coffers and their political gain.   This

denial of equal protection under the law, has caused tangible harm, including to my professional

career, disabilities and medical conditions.  The denial of the rights and services other citizens in

the City of Cotati enjoy, especially in regards to their denial of police services and protection over

five and half years, has caused harm to my family and me.

21.  The City of Cotati has established a pattern of unequal treatment under the law, consistently

giving a few privileged citizens of Cotati rights over my equal rights to the same governmental

services.   They have established a pattern… The City facilitates/gives privileges to another citizen

AMENDED COMPLAINT

1  or family who in turn, harass my family and financially gain from the facilitation with their

2  interactions with the City, while I am denied the same governmental benefits of city services and

3  financially harmed by these relationships between the privileged citizens and the City.

4  22. The City is also able to financially gain in these relationships, i.e. receiving building and

5  development fees or not cleaning up environmental contamination by their actions.  The first series

6  of events were from 2014-2016 and is related to a fire/six explosions next door that contaminated

7  our property.   The second series of events were from 2018 to the current time in 2020, which are

8  related to my opposition to two current building projects in Cotati, which are the only two major

9  projects going through the approval process in the City of Cotati currently.

10  **BACKGROUND ON THE CITY OF COTATI'S UNANIMOUS VOTE RECORD AND**

11  **THE FINANCIAL AND POLITICAL CONTROL OF THE CITY ON ISSUES BEFORE**

12  **THE CITY.**

13  23.   On its face, Cotati is unique in that it was a 99% unanimous vote record with its city council

14  votes since 2009.   To achieve this vote record, the City has developed many modes of operandi,

15  unwritten policies which are aimed at suppressing free speech and any opposition to its unanimous

16  ways.   These behaviors are directed at the few citizens, including me, who oppose their actions.

17  One other such person is George Barich, who had a free speech civil rights case in this court in

18  2015, where Judge Vince Chhabria said that he never wanted to hear about the City of Cotati

19  chilling free speech rights again.   Yet, here we are again, in federal court, concerned about the

20  chilling of free speech rights and expression by the City of Cotati.

21  24.   Since 2009, all items before the council have passed favorably—for over a decade now all

22  agenda items have passed before the council.   Their voting record is that 99% of the council votes

23  are unanimously in favor of the agenda items since 2009.   Only a handful of the council votes

24  have been 4-1 votes in over 10 years, but all resolutions have passed.   In 2018 and 2019, all council

25  votes were unanimous.   Since 2003, only two items have not been passed by the council—one in

26  2007 and one in 2008.

27  25.   Over time, the effect of public input not mattering due to the unanimous vote record, has led

28  to most city council meetings having very low attendance records.   Some citizens might come for

AMENDED COMPLAINT

one item on the agenda, but in 2018 and 2019, there were only usually 2-4 citizens that stay for the whole meeting.

26.  The few citizens at the future agenda items public comment period, have for at least 4 years asked for a number of items to be put on the agenda to the City's refusal to do so.   Examples of these issues are senior services, homelessness, and weed abatement.   This contributes to the tight control the City has on what projects and services are financially funded in the City of Cotati.

27.  The City has denied the citizen's requests to put weed abatement enforcement on the agenda now for four years.  The citizens who regularly attend efforts to have this item heard as an agenda item intensified their efforts after the October 2017 firestorm in our county, the Camp Fire in Paradise in 2018, and most recently, the Kincade Fire in our county in October, 2019.   The City of Cotati has not enforced its own city weed abatement code since 2008.

28.  This situation, on its face, is unique in its own right, and demonstrates the tight control the City has on financial and other decisions of the city.  The city enjoys the financial benefits and political advantages of having tight control …i.e.  the City decides what is built in our city, which policies/laws are enforced, etc.   The public knows that their input does not matter ultimately in the decision, because the agenda items will pass unanimously based on a decade's long history.

**BACKGROUND RELATING TO 2014 FIRE/EXPLOSIONS UNTIL MARCH, 2016**

29.  Before 2014, my family and I had a normal relationship with the police, city council and staff in our city.   We had good relationships with our neighbors, including Defendant Mark Landman, who is a close neighbor, backyard to backyard.   We had only a few times had to have the police come to our house, for events such as being a victim of a burglary.   No one in our household had a criminal record or any contact with the Cotati Police for at least forty years for any of us committing a bad act.    A few times we had code enforcement come out for events such as a new electric panel.  I hadn't attended a city council meeting since 7th grade.    We had "no reputation" as a family and lived ordinary lives as citizens of Cotati.

30.  I became involved in city politics only after a June 2014 fire and explosions next door to us within the city limits of Cotati that also caught our family home on fire. The fire and explosions were the equivalent of a three-alarm fire next door that involved seven local fire agencies, and a

AMENDED COMPLAINT

massive response from PG&E due to a natural gas explosion.   The explosions were heard four miles away, and ash fell 1 ½ miles away.   Luckily, there were no injuries or fatalities in the multi-home incident.   The next-door neighbor's main home was completely destroyed, leaving a converted garage accessory structure damaged, but still standing.

31.   The day after the fire, the neighbors were already power-washing the fire debris onto our property and into the city's stormwater system.   Within a few days, they were bulldozing the fire debris (and dust) towards our house.

32.   During our brief encounters in the first week, the neighbors assured us that they had regular fire insurance.   However, it was strange that no fire investigators were sent out by their insurance company, when our homeowners' insurance had sent out 5 different experts within the first week.

33. The first few weeks, there were also conflicting stories in newspaper reports of the number of people at the fire.   The newspaper reports said the neighbor acted alone in trying to put out the fire.   I had repeatedly been told by other neighbors on the date of the incident that another neighbor was at the house and yelled, "Dave, it is going to blow … we have to get out of here".    I sent a few emails to numerous Rancho Adobe Fire District staff and City of Cotati employees and council members, about why the neighbors were being allowed to power-wash the debris into the storm gutter, our property, and the city's water system.  I had also expressed concern that their relatives had parked a RV in a field close to the house, with a gas can and a propane tank out in extremely hot July weather.   These are the only actions I did concerning finding out about the cause of the fire and explosions, and concern for safety right after the fire.

34.   Eleven days after the fire, there was a harassment incident by the neighbors, in which they yelled details only known to emails to the City and the fire officials, i.e. my concern for the power-washing into the gutter.   They accused me of causing their relatives' RV to be thrown off another neighbor's field by the City.   These details were only mentioned in emails to the City and the fire district officials.

35.   I was chastised by many neighbors and eventually the Cotati police on a rumor generated by the next-door neighbors for supposedly going door to door implicating people for the cause of the fire, including to the City's police officers.   This was untrue. Early on, the insurance companies

AMENDED COMPLAINT

1  determined our family was 0% at fault for the fire and explosions, so I would have no motive to
2  do so, even if it was true that I went door to door.

3  36.  Due to the toxic dust and power-washing, and my then 77-year-old mother (Christine
4  Alderman) becoming ill from the toxic dust bulldozed towards our home, our insurance company
5  put us up in a hotel in Rohnert Park soon after the harassment incident. My mother and I enjoyed
6  relative safety for the 3 plus months while at the hotel in another city, Rohnert Park.   The hotel
7  was instructed to not give any information that we were staying there.

8  37.  At the same time as being put in the hotel in early July, hearing of my mother's illness and the
9  lack of response from the City, the Rancho Adobe Fire District's fire marshal ordered the neighbors
10 to stop work.    This was not in his jurisdiction to do so, but he felt compelled to do so to protect
11 my elderly mother's health.    The neighbors agreed to the fire marshal's order that a professional
12 haz mat level team perform the cleanup.    In November, eventually the sediment from the power-
13 washing tested at a toxic level for petroleum byproducts, metals, and other contaminants, i.e.
14 arsenic.   My elderly mother had approximately two months of lung issues due to the exposure of
15 the toxic dust in those first 10 days of the neighbor's illegal clean-up.

16 38.  By the end of July, the Rancho Adobe Fire District's report on the fire had been completed,
17 and at that time, we learned that the neighbors did not have "regular" insurance, but "forced
18 mortgage lender insurance", and that they therefore did not have liability insurance.

19 39.  A few days after we arrived at the hotel in mid-July 2014, my mother was confronted alone at
20 our house when she went to pick up some items.   The neighbors threatened to her that "if she
21 didn't get rid of Laurie", that she would have the City and the police make her life hell.    The
22 neighbors told her the police had their back, not hers.

23 40.  A few days later, I went to the house to retrieve some items.   The neighbors severely harassed
24 me, including saying I would be going to jail (which was odd to me) and again stated to me that
25 the police had their backs, not mine.   I waited for about an ½ hour calming down, and went to the
26 police station to report the harassment.   Meanwhile, the neighbors had gone to the police station
27 and told complete lies about the situation—that I did the harassment, when I hadn't said a word
28 during the harassment incident.

AMENDED COMPLAINT

1

2   41.   When I arrived at the police station, I was lectured on my behavior and the property rights of

3   the neighbors.   I walked out of the police station after the officer confirmed that the neighbors

4   had spoken to him first.   When I returned to the hotel, I was in tears.   My mother, concerned,

5   called the Cotati police station to speak to the officer.   The officer said that she needed to control

6   me and my behavior in harassing the neighbors.   She was told that there would be consequences

7   if I wasn't "controlled".   The officer told my mother to stop speaking to fire and insurance

8   investigators telling "my lies".

9   42.   In late July 2014, the ex-City manager, Dianne Thompson, in writing, denied the City's

10  responsibility for the fire ruins and contamination of our property, when in actuality it was the

11  city's sole jurisdiction over the fire ruins.   This lack of response by the City resulted in my asking

12  many county, state and federal (our neighborhood is in a federal critical habitat) agencies over the

13  next few months to intervene in the situation.   In late August, 2014, the city did acknowledge that

14  it had jurisdiction over the ruins by allowing the neighbors to start once again an haz mat level

15  clean-up by themselves.   These emails I sent to the county, state and federal agencies were shared

16  with the neighbors without a public records act request by the City.

17  43.   While we enjoyed the safety of the hotel, we occasionally would need to visit our property for

18  various reasons.   Whenever my elderly mother or I went to visit our property and the neighbors

19  were there, we would be verbally harassed.   The neighbors would also report our fire repair

20  contractors' employees as breaking and entering; and the City police would come out to investigate

21  the situation with the contractor's workers being in our house.

22  44.   The neighbors would still quote words and phrases that I had only been writing in city emails

23  during their harassment.   In October 2014, my attorney went down and found a stack of my emails

24  written to the city personnel in the neighbor's building file.   When I went down two times later

25  that week, there were no such records present in the file.   Despite California Assemblyman Marc

26  Levine's intervention in this disclosure of records in October 2014, the neighbors continued to cite

27  phrases and information from my emails to the City during the next two years until the professional

28  abatement of the property.

AMENDED COMPLAINT

5. During this time in fall 2014, the husband repeatedly stalked me, the police officers said that it wasn't illegal to follow someone (I had made many evasive maneuvers).   When the neighbors trespassed, the officers said that it wasn't trespassing.   They never would write reports or come to deal with the neighbors screaming obscenities at me and my elderly mom—a records act request two years later resulted in "no responsive records" for these police reports the officers said had been written supposedly over those two years.

46. Whenever I went to the police station to talk to an officer after a harassment episode by the neighbors, I always received lectures on my behavior.   I usually hadn't said a word.   This was on the advice of my lawyer that to be seen legally as pure harassment, I had to remain silent while the neighbors harassed me.

47. The neighbors gloated many times that they had the City and the police on their side.   On many occasions, especially during the early months, the neighbors kept saying I was going to jail. I thought this was odd behavior considering that I hadn't committed any bad act or a crime.

48. In October 2014, the main repairs on our house were finished and our insurance was sending us back to our home despite our requests for more time for our safety.   There was a power-washing incident over the weekend with my neighbors' power washing a great deal of the fire debris materials into the city's gutter and storm system down the stormwater drain at the end of the street. I was in contact with the North Coast Regional Water Board, who wanted me to preserve the evidence of the power-washing, which included buckets worth of toxic sediment in the sidewalk gutter in front of our house.

49. Due to this situation while the neighbors were actively power washing into the gutter and our property, we stayed in the hotel for three more nights at our own expense.   When we returned to our property, I was severely being harassed because I was trying to get the neighbors not to clean up the toxic sediment in front of our house.   My elderly mother called the Cotati police because the neighbors were severely harassing me.   The police officers arrived.   One officer talked to me about the neighbor's rights to clean up the gutter in front of our house and debated with me about the word "evidence" that I was trying to preserve.

AMENDED COMPLAINT

50.   Meanwhile within one minute of the other officer talking to the wife of the family next door, that police officer called the one talking to me over; then police officers left. There is a video of this whole encounter—I brought down a DVD of this encounter to the police station. Later PRA requests denied that there were responsive records of the encounter.    The neighbors continued shoveling up the toxic sediment in the gutter for 4 hours, and harassing us, including "mooning" us and saying they could get away with any behavior and the City and police would let them.

51.   That is the day that my mom and I consider the day we stopped feeling safe in our home and no longer had property rights or police protection.   It is the day we knew that my contacting the multiple agencies had consequences we had to live with.      We knew that the police nor the City would not protect us from harm.    That is the day we learned that protections under the law, police protection, and rights to other city services were granted to other citizens, but not us.   It was better for us to not speak out, accept living in a toxic environment or face the consequences of speaking out with our neighbors, the City and the police.

52.   Not once, were our property rights considered in the 17 months while the neighbors were living on the contaminated property, was our rights as property owners considered.  Our health and welfare were not considered or given the same equal treatment as the neighbors.   We were subjected to living in a toxic environment (contaminated soil that poisoned and killed my two cats) for almost 2 years, because of the city's actions to unequally enforce laws, giving privilege to the citizens next door over any of our rights by delaying an abatement for nearly two years.

53. Another time that month, my attorney and I had stopped by our house to pick up some items. The husband stalked me once again with my attorney in the car.   My attorney (who also lives in Cotati) was so concerned about my personal safety at that time, that I stayed in an extra bedroom at her house for a week.

54.  Suddenly, our home and property became the hot bed of the neighborhood for vandalism (i.e. toilet papering), occurring about twice a week, usually at night.  In 45 years of living at our address at that time, we had never had an act of vandalism to that point.    The police when called would say that we couldn't prove it was the neighbors doing the vandalism.   These vandalism events

AMENDED COMPLAINT

1  lasted for about a month, until we received a one-way restraining order.    The police did not come
2  out when we asked them to in reporting this vandalism.

3  55.   We were not treated equal under the law as other citizens in the city.    While we would
4  complain about dozens of building codes not being enforced to no action by the City or police, all
5  the neighbors had to do was complain once during this time , and we had to have what ended up
6  as a re-inspection of a re-inspection of a re-inspection of an inspection of fire repairs that were
7  exempt (in November, 2014).    Plus, the city inspector would come out and say the repairs were
8  up to new code anyways.    These inspections were on fire repairs that the neighbors were
9  determined to be at 100% at fault as far as cause.

10  56.   The neighbors were supposedly issued a "temporary occupancy permit" to live in the fire
11  damaged and unpermitted converted garage.    There was no actual paper permit, and the neighbors
12  were allowed to live in the fire damaged garage for 17 months, when the State of California fire
13  codes do not allow for issuance of a temporary occupancy permit for any fire damaged building.

14  57.   We were able to get a non-CLETS restraining order against the next-door neighbors in
15  November 2014.   However, the Cotati police, not once enforced the restraining order when
16  requested to do so.    Even the Chief of Police, Michael Parish, in 2015, refused to enforce the
17  restraining order at two public hearings in regards to the neighbor's property, despite my family's
18  requests to do so.   We soon realized that having a restraining order gave us no protections as other
19  citizens with similar restraining orders had under the law.

20  58. Another example of the lack of police protection happened in May, 2015.   The neighbors
21  turned over a burnt-out RV converted bus that had exploded in the fire explosions and let it idle
22  on their property for about 30 minutes.   Concerned about our personal safety and overall the public
23  safety of the converted bus being on the roads with broken out windows, leaking fluids, damage,
24  etc., I called the Cotati Police.   While the dispatcher said she would send an officer out about our
25  concern over public safety, but instead we received a phone call a few minutes later from an officer
26  saying that he would not come out.   I then called the local CHP office, and the CHP dispatcher
27  said that once they were on the road the CHP would take jurisdiction.   I called back to the CHP
28  once they drove off their property.       The CHP tried to locate the converted bus, but were

AMENDED COMPLAINT

unsuccessful.   I asked the city council, the city staff, and the police department to investigate this incident to no response from anyone.

59.  The neighbors were able to live illegally on the property without having any consequence for not following many laws and building codes for 17 months with the City facilitating this.   This allowed also the City to not have to pay the financial cost of an environmental clean-up due to their negligence of not enforcing building codes or supervising the clean-up of the haz mat level fire ruins.

60.  Once their foreclosure sale went through, and the neighbors walked away from at least $500k in liabilities, the City, again, treating an entity unequally under the law, imposed many building code violations on the foreclosing bank.   This included a costly abatement of the property by the foreclosing bank in March, 2016.   Our family incurred approximately $20k of expenses (legal fees and for home repairs that would have been covered with liability insurance) from the date of the fire to the date of the abatement in March 2016.   This was for an incident that we were determined to be 0% at fault for.

61.   It is indeterminable what effect living in a toxic chemical environment had on my family's health for the 21 months after the fire and explosions.   I received intensive medical treatment during 2015 and 2016 for PTSD and chronic pain (See Exhibit 1).   By mid-2016, I was no longer holding my muscles in the "fight" position because of PTSD that was affecting my spinal cord condition.

**Background-- Mid 2016-2018   Reputational harm by City, chilling free speech**

62.  After the abatement in March 2016, and the property being bought by a local family who knew the history of the contaminated soil and the response to the contamination by the City, my elderly mother and I had some sense of safety in our home return to us.

63.  By that time, the issues related to the fire were minimal that I spoke of in council meetings, and I was well established as a citizen known to speak at council meetings.    Because I was on SSDI, there were not many ways for the City to economic or personally harm me in speaking out at council meetings on issues before the council.    I was not working yet as a paralegal, but completing a paralegal program.      Reputational harm by the city/state did not impact me because

AMENDED COMPLAINT

1   my governmental benefits were mostly on the federal level, i.e. SSDI and Medicare.  I also did not

2   challenge any city building projects that the City was involved in during these two years.

3   64.  However, many times when I opposed a general item, I would be interrupted multiple times

4   during my 3 minutes allowed of public comment.    Others were allowed to speak without

5   interruption if they were in favor of the item.

6   65.  By 2018, while it was troublesome to have my free speech chilled by such actions as new city

7   council rules (against California's Brown Act) being enacted to further limit public input allowed,

8   it wasn't doing harm to my life on a daily basis to have my free speech chilled.   I received the

9   same police protection as other citizens in my neighborhood (a rare occurrence of seeing a police

10  car in our neighborhood because we have a very low crime rate in our neighborhood because of

11  its hidden from view location).   I received the same amount of City Services as the other citizens

12  in Cotati as far as dealing with water/sewer services, etc.  It was just my reputation being affected,

13  but I was moving on.   I had worked hard to change careers and obtain my paralegal certificate in

14  May, 2018 (See exhibit 1).

15  66.  However, starting in early 2018, the stakes to the City intensified financially.  The attempts

16  both online and in council meetings to chill my speech intensified, painting me as untruthful and

17  having mis-informed facts and continuing a previous theme of painting  me as "psycho" as the

18  City and the neighbors had done during the first 2 years after the fire.  The City moved on to

19  actions other than chilling my speech that affected and harmed me medically and professionally,

20  now that I was seeking work as a paralegal.

**FACTS WITHIN THE STATUTE OF LIMITATIONS**

22  <u>Early 2018- present:  City has financial interests in what I oppose, start chilling my speech with</u>

23  <u>actions</u>

24  67.  While there were other building projects, I didn't oppose generally built in 2016-2018, starting

25  in 2018 there were two general building projects that the City had/still has a great financial interest

26  in.   These are the only two building projects in Cotati in the processing of going through approvals

27  to be built currently—there are no other major projects in the City requiring approvals.   Once I

28

AMENDED COMPLAINT

started opposing these projects, the actions of the City became more than "mere words".   I was also finishing up my paralegal program and ready to start a new career at this time.

Background on the 2 building projects the City has financial interests in.

68.  The two projects that the City has a deep financial interest is the "hotel project" and the Cotati Commons Marketplace development.    The hotel project is for a hotel on city owned land that the City will receive $2.3 million for if the hotel is developed.    It was a Caltrans Park and Ride lot that was gifted to the City as surplus land.

69.    At the site of the hotel, a $5 million sewer project was completed in the Spring of 2019, partially built for the hotel as the hotel could not be built with the existing sewer capacity.  This sewer project is for a city of 7500 citizens, and was over $2 million in its budget.    Another issue, is that it planned to be a 4-story hotel.   The local fire district does not have a ladder truck, and the City wants to rely on mutual aid for a ladder truck, which the closest would be about 20 minutes away from the hotel.   I adamantly opposed the issue of the ladder truck due to concerns of any guests with disabilities like myself staying on the fourth floor.   Lastly, there are traffic problems with a right turn only lane off the freeway right in front of the hotel.     It is well known about the hotel project with the citizens of Cotati.  Mark Landman posting on Nextdoor.com has repeatedly attacked my information I post as "misinformation", when I did  have sources for my information, i.e. direct quotes from fire officials.

70.  The other building project is the Cotati Commons Marketplace, which includes the Cotati Cottages housing development (40 new homes) and an assisted living/memory care/cannabis dispensary project on about 14 acres.     This whole area is in the federal and California critical habitat of the California Tiger Salamander.  The City has extended the tentative maps of the project from 2003 to the present day.   The CTS became a federally endangered species in 2003.    The City of Cotati holds the mitigation bonds for the area (South Sonoma Business Park).

71. Additionally, there are 3 dangerous turns near the proposed developments.  One turn near the project was in the 1998 General Plan as a priority project to be corrected for a 270-degree left hand turn off Hwy 116, to no action in all these years.   The cost to put stoplights and intersections as outlined in the General Plan is $10 million.   The City has no monies specifically saved for these

AMENDED COMPLAINT

improvements, and are now considering for approval or approving the projects without the improvements when concurrently trying to approve development project such as a memory care facility next to highway 116 with 17k vehicles a day.

72.   The City has buried the information on this development in their website, so I was suddenly the only citizen opposing this development because nobody knew about the projects.    When I started informing my fellow citizens on Nextdoor.com about the project in the summer of 2019, is when the actions by the City, especially Mark Landman online on Nextdoor.com, greatly intensified.

Social Media shaming and cyberstalking starts in 2018/Involvement of citizen Mr. Mora.

73.   Being the only one publicly opposing the Cotati Marketplace development, this attracted the attention of another Cotati citizen, Christopher Kren Mora, who has a financial interest in the Cotati Cottages, initially in July 2018, but more actively in June 2019.

74.   Mr. Mora lives the current Cotati Cottages project completed 2 decades ago.  He is the president of the Cotati Cottages HOA.   There is now a shovel-ready project which is basically Cotati Cottages Phase II, next to the current Cotati Cottages development where Mr. Mora resides. This project is owned on land by Mr. Monahan.    Mr. Monahan also owns the land next to the Cotati Cottages new project, where a memory care/assistive living/cannabis dispensary is proposed and going through the approval process currently.   Mr. Mora has close communications with Mr. Monahan due to Mr. Mora being the president of the HOA of Cotati Cottages, which Mr. Monahan developed and is seeking further development next to the existing Cotati Cottages.

75.   Mr. Mora's actions started in July 2018, with a few phone calls and posts on Nextdoor.com. Once the Cotati Cottages and Memory care facilities properties going the public input processes, in the summer of 2019, i.e. the EIR, Mr. Mora's behavior and actions towards me has increased dramatically.

76.   Additionally, the recent records act responses received shows that Mr. Mora has been sharing this federal lawsuit with members of the city, i.e. planning commissioners and the general public since it was filed in September, 2019, especially during a seven-week period in December to

AMENDED COMPLAINT

January when his cyberstalking was 24/7 on social media platforms.    Mr. Mora repeatedly degraded the reasons for the lawsuit in his emails to the public and planning commissioners.

77.  Additionally, the cyberstalking increased to 24/7 when it was discovered in December 2019, that Mr. Mora has owned a gay porn media company with a website and sex toys warehouse in Cotati since 2009.  It is an unregistered, unpermitted, especially for permits for an adult orientated business within Cotati.   This relationship with the City has been able to continue in business with no consequences legally with the City or the City's police for a decade.

June 2018 – March 2019.    Series of 2018 traumatic experiences regarding public safety issues with the City and the police leads to a deterioration in my health.

78.  In June 2018, there was a traumatic experience that changed the circumstances.    On the freeway that goes through our city, there was a five-vehicle accident.   The hillside caught on fire, about a block away from our house.   Traffic was diverted off the freeway and into the city streets of Cotati in both directions so that a helicopter could land, etc.

79.  I was driving, when someone ran a stop sign and almost hit me.  I went to the police station to say that they needed to have more officers directing traffic in the city.   The dispatcher said there weren't any officers available as the two officers on duty where on the freeway exit with the CHP directing traffic off the freeway.   Our city of 7500 had no officers on duty on the city streets during a crisis situation.

80.  I had talked to some ex-Cotati police officers before this incident and they had said that there were only 1-2 officers on duty for the whole city at a time.   After the incident, I contacted a few more ex-police officers and they confirmed that for a decade, there had only been 1-2 officers on duty at a time usually—some had left because of this burden on themselves to be responsible for a whole city's welfare.

81.  This knowledge activated my PTSD once again, as I once again felt unsafe in my home and community, and that there would be no police services or weed abatement because of the City's inaction for years or other measures to protect me from harm after this incident.   This was also less than a year after the deadly October 2017 firestorm that decimated communities such as Coffey Park in Santa Rosa, less than 10 miles away from Cotati.

AMENDED COMPLAINT

82. I began to take more active steps in exposing this situation and getting the truth out about the City's lack of police officers on duty and the readiness for disasters and crises, and the City has stepped up its retaliation in various ways in return.   I posted a series of posts on these incidents and the City's lack of readiness for a disaster, in the summer of 2018.   Mark Landman repeatedly degraded these posts as "misinformation" that was harming the community.   My posts were based on facts.

83.   I also took steps after this incident to address that the city hadn't enforced its weed abatement policy for many years (the last time the City enforced its weed abatement code was in 2008).   The dry weeds on the hillside of the accident catching fire increased my anxiety about the safety once again in living in my home, given that the City placed our rights to feeling safe in our home as a low priority because of the City's financial gain previously.

84.   The next month in July 2018, there were 2 more incidents on the freeway that highlighted the lack of disaster preparedness in Cotati.   One was near the proposed hotel site next to the freeway; a car accident lit the weeds on fire.   The other incident in July, 2018, that sparked my PTSD, was in Petaluma on the freeway, approximately 8 miles away, where multiple homes were burned due to the trees next to the freeway catching on fire and causing multiple adjacent homes to catch on fire.

85.   Additionally, starting when these building projects were being considered in early 2018, were being considered, members of the City and police chief Michael Parish started intimidation and shaming tactics to silence me.

Intimidation, shaming and theme of misstating facts that harmed the community begins in 2018

86.   Early in 2018, Vicki Parker, the ex-Community Development Director, told the planning commission that my concerns I had gave public comment on the hotel, "the problems (with the project) were in my imagination."

87.    In April 2018, Chief Parish intimidated me on which chair I could sit in the audience section and after telling him to consult with the city attorney on my rights to sit in an ADA accessible chair in the audience, he backed off

AMENDED COMPLAINT

88.  In early June, 2018, I was reprimanded by the mayor, Mark Landman, for saying two words out of order (while the council members routinely are out of order speaking without an agenda item present up to 10 minutes at a time).

89.  On June 28th, 2018, I said three sentences out of order, and was threatened with arrest by then mayor Mark Landman.   He simultaneously was shaming me on Nextdoor.com about my behavior in council meetings, with a reach of about 10k of households.    While mayor, Mark Landman would regularly do "speeches" on items not on the agenda for up to about 10 minutes (against the "rules" of California's Brown Act), while we few citizens who attend regularly were threatened with dire consequences if we even spoke a few words out of turn.

90.  A few days after the June 28th, 2018, council meeting, council member John Moore, wrote an email on his city email account calling me "bat shit crazy".   Initially, John Moore denied writing the email.  John Moore repeatedly said repeatedly at council meetings that I was being untruthful about this email existing.   A few months later, when it was produced as a public record, he took ownership of writing the email.  I asked the city council and staff repeatedly to file ethics charges against John Moore and I demanded a public apology for the degrading comment.  I did not receive an apology or ethics charges during the next 11 months that I asked for such at each council meeting I attended.

91.   Also at the June 28th, 2018 meeting I was talking about the freeway/hillside accident in citizens business, the lack of police protection and enforcing weed abatement for years was exposing us citizens to great harm.   I concluded with how the City didn't care about human life, or the harm they cause.  This comment led to a backlash of actions against me, starting with the email where council member John Moore called me "bat shit crazy".

92.  The events of June and July 2018 due to the incidents on the freeway regarding police protection, public safety, etc., plus the intimidating acts in previous months, started affecting my PTSD and spinal cord condition.

AMENDED COMPLAINT

<u>Fall 2018-winter 2019…. effects of PTSD symptoms aggravate spinal cord condition to the point of long periods of paralysis.</u>

93.  After these events in June and early July 2018,  I once again held my muscles in the "fight" position like I had with the aftermath of the fire/explosions dealings with the City, leading to increased symptoms/aggravation/harm to my spinal cord condition, such as increased instances of temporary paralysis of my hands and feet.    This is a pattern that happens when I am triggered into PTSD, especially with issues having to do with personal safety and protection.   I will hold my muscles in the "fight" position for months at a time, leading to major problems and deterioration of my spinal cord condition.    This sequalae of PTSD triggering my spinal cord condition is well known to the defendants.

94. After being threatened with arrest for saying three sentences out of turn, and being sent the "bat shit crazy" email from John Moore, I sent an email to the City describing my increased physical and PTSD symptoms in mid-July 2018.     I described these symptoms in an email to the City in July 2018, asking the council and staff to decrease their actions against me while I was having the temporary paralysis episodes.

95.  The council members did not decrease their actions against me.   Mark Landman continued his degradation for a few months longer on Nextdoor.com.   80% of Mark Landman's comments on Nextdoor at this time were responses to my posts.   I stopped writing on Nextdoor when my health deteriorated in September 2018.   Unlike in previous times of great stress, this time I was considered medically fragile (see Exhibit 1), and the stress exacerbated my medical conditions, to the point of nearly being bedridden for 3 months with multiple bouts of paralysis.   This medical deterioration was due to the extreme stress and duress I was receiving by the City's actions against me and the public backlash towards over the posts on Nextdoor posted by Mark Landman.

96. I stopped challenging the public safety issues of the hotel, weed abatement, etc. for six months starting in September 2018 as I knew it would be better for me if I remained silent.   There were no social media posts by Mark Landman, Mr. Mora, and me from September 2018 to approximately April 2019.   As my health deteriorated in October due to the stress and PTSD symptoms impacting my spinal cord condition, I wasn't able to physically attend as many council

AMENDED COMPLAINT

1   meetings during these months.   When my spinal cord condition is flared up, it impacts my speech
2   abilities, so that also impacted my ability to speak at council meetings effectively.

3   97.   After being nearly bedridden for 3 months with repeated temporary paralysis episodes and
4   chronic pain, by January 2019, I had lost a great number of motor skills and strength.   I began
5   physical therapy at Kaiser and up to December, 2019, I had made great progress on regaining my
6   motor skills and strength, back to where I was physically before the PTSD episode caused spinal
7   cord problems.

8   City paints my input as misinformation repeatedly in 2017-2019

9   98.   From early 2017-mid 2018, I would receive to every email the same response, no matter the
10  subject from Damien O'Bid, the city manager.   It was the same paragraph over and over again for
11  about 14 months.   The phrase was "I have reviewed your correspondence and strongly disagree
12  with your assumptions and conclusions.   The statements that you present as facts are misinformed,
13  as well as displaying a bias against the City, its officials, and staff."     Other citizens in Cotati,
14  obviously received replies to their emails to Damien O'Bid during this time without this statement.

15  99.   In early 2018, Vicki Parker, the Community Development Director at that time, at a planning
16  commission meeting said "the problems (with the project) were in my imagination" when a
17  commissioner asked about my public input into the hotel project.   The next year, in June 2019
18  Mark Landman on Nextdoor.com in response to a post I did on the unanimous vote record citing
19  just facts, wrote " We're all entitled to our opinion, we're not entitled to our own set of facts".
20  My "unanimous" vote post on Nextdoor was all based-on facts gathered through going through
21  tallying votes on the minutes.    This constant degradation that my facts are inaccurate and untrue
22  has been a long-standing theme increasing during 2018 and 2019, especially when challenging
23  these building projects that the City has a financial interest in.

24  Incidents around the time of claim against the City being filed in May/June 2019.

25  100.   In May, 2019, the council, without an agenda item present, discussed this city email with
26  the "bat shit crazy" degrading wording towards me during the meeting, which was against
27  California's Brown Act. Afterwards, council member Moore then took my public record of the
28  city email off a display wall, cornered me off-camera, and bullied me about the city email.   I called

AMENDED COMPLAINT

over to the city clerk to explain to council member Moore that it was a public record she had sent me.   She acknowledged this public record.

101.  Then, at the next council meeting on June 2, 2019 at their next city council meeting, the City of Cotati council members retaliated against me. That morning I had filed the claim with the City over chilling my free speech rights. In retaliation, Councilman Moore then read the email without an agenda item present that evening, once again calling me "bat shit crazy" publicly.   Whenever I tried to speak during the rest of the meeting, he would lift up his copy of the city email and wave it at me while speaking as a threat for further humiliation.  I begged the mayor, John DellOsso to rule the councilman out of order and the mayor refused to rule him out of order.

City feeds Mr. Mora information to cyberstalk me on social media/denies me police protection from April 2019 to January 2020.

102.  While I had thought that employees of the City were forwarding my emails to Mr. Mora, this wasn't the case when I received my PRA request in late February, 2020.   At least one time, Mr. Mora has specifically asked for a PRA request for my emails to the City according to the PRA response I received late in February. 2020.  I have another PRA request in to release any records sent in PRA requests of Mr. Mora, but I will not receive the results in time to file this amended complaint.

103.  However, according to the recent PRA records, City Manager Damien O'Bid, the only "responsive" employee with PRA records, had numerous email communications with Mr. Mora from April 2019 to January 2020, which fed Mr. Mora's posts cyberstalking me.    For the month of January 2020, Damien O'Bid wrote 12 replies to Mr. Mora, and his emails reference a phone call also about me.

104.  The last time I received a reply to an email I sent to Damien O'Bid was July 12th, 2018 and it was a one sentence reply.   For over a year before that one sentence reply, I received the same phrase to any email I sent Damien O'Bid, "I have reviewed your correspondence and strongly disagree with your assumptions and conclusions.   The statements that you present as facts are misinformed, as well as displaying a bias against the City, its officials, and staff."    Mr. Mora

AMENDED COMPLAINT

obviously benefits from the city manager's services, where I have been denied his services for years because of my opposition to the City's actions.

105.  The latest PRA request also shows that when I was enduring worst of the cyberstalking in January 2020, the only City action in the whole situation was to grant Mr. Mora a public records act request of my emails to the City.   This was towards the end of a seven-week 24/7 cyberstalking effort by Mr. Mora.   During this time in mid-January 2020, I was asking everyone for help with the cyberstalking, even being so desperate to try to get a gag order from this Court.    I requested help from the Chief of Police, the city council, city staff, two Sonoma County supervisors, the city attorney (Mr. Bakker) and the lead attorney on this case.    I asked for police intervention to stop the cyberstalking.   The City, the police, the county supervisors, and the city's attorneys did not reply to my emails and did not take any action other than to fulfill a PRA request for Mr. Mora, which increased the intensity of the comments referring to my emails to the City in late January 2020.

106.  The timing of the PRA request to the reference to the PRA request shows that the City produced Mr. Mora's request in a timely manner.   My PRA request at the end of January took a month to receive incomplete responsive records.    Mr. Mora posted on Nextdoor.com replies to his emails from at least one other employee who I had requested email communications to Mr. Mora from in my PRA request—and this employee did not send "responsive records".     I do not receive equal treatment as far as diligence, timeliness and effort when it comes to PRA requests also as other citizens in Cotati enjoy.

Mr. Mora uses my pleadings in this case to feed Mark Landman's degrading posts on Nextdoor.

107. With the recent records act response, I also learned that Mr. Mora has been sending many of my pleadings in this case to other public officials, including planning commission members, as well as members of the public.   Mr. Mora was citing the issues of this case on Nextdoor.com. Council member Mark Landman would make comments about his rights to speak, and write degrading comments about my efforts with the lawsuit.   I would publicly post that these were issues that needed to be heard in a courtroom and not to hold trial on social media.   This led to Mark Landman going back and forth with Mr. Mora on Mark Landman's free speech rights and

AMENDED COMPLAINT

the issues in this case.   Mark Landman incited others against me for bringing up that these issues should be heard in a courtroom, not on social media.  Some of the "neighbors" on Nextdoor.com demanded that I post a copy of my complaint online so they could scrutinize it in response to Mr. Mora's and Mark Landman's posts.  I refused to, saying they could access themselves online as it was public record if they so chose to need to read the pleadings.

108.  In recent months, Mark Landman also has incited others by holding me accountable for other people's speech, especially George Barich's speech who has been in a decade long feud with Mark Landman.   George Barich does regularly do inflammatory speech that sparks strong emotions on both sides in our community.    I do not engage in the same type of speech—my speech is based in facts and does not personally attack the council members.

109.  Mark Landman repeatedly attaches my name in various forms to George Barich in order to attack George Barich in social media.    He repeatedly has called George Barich "my colleague", talked about "both lawsuits", and made statements about the few citizens who attend city council meetings (which are mostly George Barich and me).    Mark Landman has called me in recent months, "poison on community meetings" and other demeaning names because of my friendship with George Barich.   One such comment on social media: *I can tell you as a city council member here in Cotati for the last decade, that the level of angry, disgruntled negativity you've seen on those posts and quoted in this thread is exactly what we on your city council are faced with at every single meeting, coming specifically from two individuals with what are in my opinion personal vendettas against this community.  I want to thank everyone who has posted for reminding me of the values Cotati truly holds, it's appreciated.*

110.  This was on a post on Facebook.   It was a mutual Facebook friend of Mark Landman and mine, reacting to a comment from George Barich telling an Iranian national to "not get his turban in a twist".    I was attacked on this Facebook post numerous times by people in my community, because I wouldn't call George Barich a racist, only that he made a racist comment.    Mark Landman took the opportunity to defame me in our community, because he was trying to fuel the feud with George Barich, dragging me into the mix.    It was only by chance that Mark Landman and I had a mutual Facebook friend that I read this post.    It is hard to determine if there have been

AMENDED COMPLAINT

1    other such posts defaming me in the community by Mark Landman because of my friendship with

2    George Barich.

3    111. Comments like these on social media, have caused harm to my budding paralegal career.

4    Mark Landman incites people to report me to Nextdoor, which gets me temporarily blocked.

5    Corporate Nextdoor finds out the true situation, and grants my access back.   In the meantime, I

6    have lost at least two opportunities to do paralegal work while blocked, because I couldn't access

7    the prospective employer's personal message on Nextdoor.

8    112.  Mark Landman, acting as an agent of the City, also continues a long-standing theme of the

9    City employees that what I write is untruthful, not based in fact, is "mis-information" that harms

10   the community repeatedly in his posts on social media.   These posts have affected my ability to

11   get paralegal work, when the person realizes I am the "Laurie Alderman" Mark Landman is talking

12   about on social media on websites such as Nextdoor that reaches 10k worth of "neighbors".

13   Essential skills of being a paralegal are the ability to be honest and factual, so this defamation by

14   an authority figure has caused harm to my paralegal career directly.

15   113.   The seven-week 24/7 episode of cyberstalking by Mr. Mora and the many posts by council

16   member Landman in reply again caused me physically hold my muscles in the "fight" position I

17   use when triggered into PTSD.   I started holding my muscles in this position again in December

18   2019.  I had not been holding my muscles in the "fight" position since January, 2019.   When the

19   incident happened with asking and not receiving any action  for police protection and help from

20   the City, police, county supervisors, attorneys, etc. in January, 2020, this progressed into daily

21   temporary paralysis episodes—I have required additional medical treatment and medications due

22   to this latest episode of my spinal cord condition being exacerbated by the stress of the

23   cyberstalking and the actions of the City.

24   114.  Once I asked for the PRA request for Mr. Mora's emails to the City on Jan. 30th, 2020, the

25   cyberstalking stopped.  Mark Landman has not replied to any of my posts on social media since

26   either.   I have been recovering well in the last month now that the 7 weeks of actions against me

27   have ended.

28

AMENDED COMPLAINT

**Facts related to the ADA claim against the City of Cotati:**

115.  My disabilities are well known to the City, including physical disabilities, PTSD, and a speech disability.   I have at times requested ADA accommodations such as accessible furniture and received an accommodation for my speech disability in the past.

116.   Repeatedly over the past two years especially, my time to speak (3 minutes) is interrupted many times during my allotted time.   This can be comments by the mayor, council members speaking on the item during my time, making gestures (i.e. the "waving" of John Moore's city email folder), and other attempts to increase my speech difficulties by the council members.

117.   In comparison, repeatedly, my non-disabled peer citizens, are uninterrupted and/or invited to speak again on the same agenda item by the mayor.    Recently, at the Feb. 11th, 2020 council meeting, a non-disabled citizen was allowed to speak for 5 minutes (2 minutes over the time limit) without interruption or input from Mayor Wendy Skillman.

118.   Additionally related to this ADA claim, is the city's choice to hold a series of budget and strategic planning meetings in the police community room for at least the last 5 years.    The City council chambers are available to be used for these meetings, which have a sound system and the room is ADA compliant.

119.    The room is set up to exclude the citizens from the discussion.    The staff and the council members sit in a square of tables facing each other.    The citizens are situated about 2 yards outside the square of tables.   The staff/council members sit with their backs to the audience.   There is no sound system or microphones available like the city council chambers have, making it difficult to hear what is being said.

120.   The only two citizens to attend these meetings in the last 5 years are George Barich and me, and we both have disabilities.   George Barich has a hearing impairment.   Repeatedly, George Barich and I have asked for the meetings to be held in the council chambers so that our disabilities can be accommodated.   Most meetings, including an upcoming series in 2020, are still being held in the police community room.

AMENDED COMPLAINT

121.     These actions to not accommodate my disabilities by moving to a ADA accessible/appropriate room have limited my ability to participate in these "special meetings" held in the police community room.    Between this denial of appropriate and ready accommodations, and the previously mentioned interruptions in the council chambers, I am discriminated against because of my known disabilities in violation of the ADA.

### FIRST CAUSE OF ACTION

### VIOLATION OF RIGHT TO FREEDOM OF SPEECH

(**Against the City of Cotati and the individual defendants, Cotati Council members: John Moore, Mark Landman, John DellOsso and Wendy Skillman, Police Chief Michael Parish and city manager**

**Damien O'Bid.)**

122.   Paragraphs 1-121 are part of this claim.

123.   By their conduct (all  individual defendants), as described herein, and acting under the color of state law to deprive plaintiff of her right to freedom of speech, assembly, and association under the First and Fourteenth Amendments, the city of Cotati and all individual defendants, is liable for violation of 42 U.S.C. § 1983, which prohibits the deprivation under color of state law of rights secured under the United States Constitution.

124.   The individual defendants all violated the plaintiff's First Amendments rights to assembly, speech, and association by repeatedly taking actions both individually and as group to "chill" the plaintiff's free speech in order for the defendants to maintain their status quo of 99% unanimous votes and passing every resolution before them for the last five years.

125.   As a consequence of the defendant's actions, plaintiff has suffered violations of her first and fourteenth amendment rights to free speech, assembly, and association.

126.   The City's and individual defendants have repeatedly in the course of their retaliation to the Plaintiff's opposing speech, completed a series of actions denying the plaintiff equal protection under the law described in the 14th Amendment.    This is especially true as far as the plaintiff's rights to police services and protection as enjoyed by other citizens of Cotati.   Plaintiff's rights to equal police protection have routinely been denied over the past 5 ½ years.

AMENDED COMPLAINT

1
2
3

47.   As a proximate result of all individual defendant's unlawful actions, plaintiff has suffered damages including physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

4
5
6
7

**SECOND CAUSE OF ACTION**

*MONELL CLAIM*

**(Against the City of Cotati)**

8

127.   Paragraphs 1-126 are part of this claim.

9
10
11

128.   All of the acts and omissions by the individual council members, city manager, and the police chief described above were carried out under policies and practices of defendant City of Cotati that existed at the time of the conduct alleged, and were engaged in the full knowledge, consent, and cooperation and under the supervisory authority of defendant City of Cotati.

12
13
14
15
16
17
18
19

129.   Defendant the city of Cotati and its individual employees, adopted "unwritten policies" that have resulted in their 99% unanimous vote record and every resolution passing within the last five years (717 of 717 resolutions).    This culture has established a custom that is widespread and a well-settled practice that constitutes a standard operating procedure.   It is their custom to comment at inappropriate times on the agenda on the context of citizen's comments, mostly degrading the citizens, these comments by the city council and staff serve to chill citizen's exercise of free speech at public council meetings, thereby oppressing the expression of views and experiences of the citizens.

20
21
22

130.  Defendant City of Cotati, by its policy-making agents, servants, and employees, authorized, sanction and/or ratified all individual defendants/employees' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

23
24
25
26
27
28

131.   The constitutional violations by the City of Cotati, through the actions of its employees and council, were proximately caused by the policies, practices, or customs developed, implemented, enforced, encouraged, and sanction by defendant City of Cotati, including the failure to:   (1) adequately train its officers and agents, thereby failing to adequately discourage constitutional violations on the part of its officers and agents; and (2) properly monitor and discipline its council members, employees and officers, including Chief Parish.

AMENDED COMPLAINT

132.  All defendants' unlawful actions were done willfully, knowingly, and with the specific intent to deprive plaintiff of her constitutional rights under the First and Fourteen Amendments of the U.S. Constitution.

133.  All defendants have acted with deliberate indifference to plaintiff's constitutional rights.   As a proximate result of these acts, plaintiff's constitutional rights have been violated, which caused her to suffer physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

134.  Plaintiff has no adequate remedy at law and will suffer serious irreparable harm to her constitution rights unless defendants are enjoined from continuing their unlawful practices, policies, and/or customs that have proximately caused these abuses to occur.

### THIRD CAUSE OF ACTION

### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

### (Against the City of Cotati)

135.   Paragraphs 115 to 121 are part of this claim.

136.   I, Laurie Alderman, the plaintiff am known to the City of Cotati to have disabilities acknowledged to be qualified under the Americans with Disabilities Acts, from previous ADA accommodation requests to the city.

137. The city of Cotati and its agents are aware of my disability of a spinal cord condition that can lead to temporary paralysis if my PTSD condition is triggered.  This is known from email communications and verbal conversations to them from me, that stress exacerbates my condition and can lead to further disability.

138.   Repeatedly, the City of Cotati through its agents, have denied me appropriate ADA accommodations, including use of the ADA appropriate city council chambers.

139.  By targeting by ADA disabilities, the city of Cotati and individual defendants violated my rights to full and equal enjoyment, privileges and advantages of the City as other non-disabled citizens in Cotati have.

140.  Their retaliatory acts specifically targeting my ADA disability status in order to chill my free speech rights, have caused physical, mental and emotional harm to me and my family.

AMENDED COMPLAINT

**PRAYER**

Wherefor, plaintiff Laurie Alderman prays for a judgment as follows:

1. An injunction enjoining all defendants from engaging in conduct to unlawfully disrupt, disperse, interfere with, or prevent the lawful First Amendment activities described herein;

2. An injunction enjoining the defendants from engaging in conduct to unlawfully violating the Americans with Disabilities Act described herein;

3. An injunction from engaging in practices and conduct that violate the equal treatment under the law clause of the 14th amendment in regards to receiving services, such as police protection and city services.

4. An award of compensatory damages; these damages shall fund a special needs trust for the plaintiff.

5. An award of exemplary damages; these damages shall fund a special needs trust for the plaintiff.

6. An award of costs of suit under 42 U.S.C. §§ 1920 and 1988.

7. For such other and further relief as the Court deems appropriate and just.


Respectfully submitted:

Dated:  February 29th, 2020          /s/ _Laurie Alderman_____

                                             Laurie Alderman,

                                              Pro Se litigant

Electronically signed by Laurie Alderman on 2/29/20.

AMENDED COMPLAINT

EXHIBIT 1

Background related to medical conditions, disabilities, education, career, etc.

1.  Once again, I will be writing in first person voice as a pro se litigant in this section.

2.  For over 25 years, I worked full-time with the disabled community in various positions.  I also worked at the same time various jobs in human service and business positions in a supervisory capacity, using my skills from a business background.   I have a bachelor's in business administration with a minor in social work from Sacramento State University from 1986. Later on, I continued on in my education, receiving a masters degree in occupational therapy from the University of Sydney in Australia in 2004.   I went on to practice as an occupational therapist in Indiana and Michigan starting in 2005.

3.  Before the events of the fire/explosions in 2014, I had returned from Michigan to our family home (now living in Cotati for 50 years) after becoming seriously ill and going bankrupt from medical bills early in the decade.   I recovered somewhat from the serious illnesses upon returning to our family home and was working part-time as late as 2013.      I was also dealing with being in a bankruptcy caused by medical bills from Michigan.    In 2012, I filed successfully, my own bankruptcy pro se.    I also successfully defended myself by pro se in Sonoma County Superior Court, actions filed against me related to the bankruptcy and my student loans over the next few years.  This sparked my interest in advancing my legal skills, but there was not a paralegal program available to me at the time.

4.  I made a good recovery from the serious illnesses and was stable in my medical conditions and able to work part-time in 2012 and on, while I was on social security (SSDI) , Medicare and Medi-Cal.    I physically was likely to return to work full time within the next few years as an occupational therapist.   I had financial stability for the first time in many years though through being on SSDI and Medicare.

5.  In early 2014, I received the diagnosis of cervical spinal stenosis and the specialists determined I was not a candidate for surgery.    I had mild compression of my spinal cord in 2014.    The neurosurgeons warned that continuing to work with the disabled was at great risk to me, that I if I received a blow to my spinal cord/cervical region, it could lead to me being quadriplegic.    I also

AMENDED COMPLAINT

received the prognosis in 2014 that the cervical spinal stenosis would likely very slowly progress, possibly into quadriplegia.   I was deciding what my next steps were in June 2014, when the fire/explosions happened next door.     The events surrounding the fire and explosions severely disrupted my plans over the next two years.   Additionally, the trauma of all that I went through with the fire and the city's response to the fire/explosions exacerbated my post-traumatic stress disorder into acute symptoms.  I was always holding my neck and shoulders in the "fight" response after the fire, which impacted my cervical spinal stenosis diagnosis.  I received intensive treatment for PTSD, the cervical spinal stenosis/spinal cord compression and chronic pain in late 2014 and 2015.

6.  Starting to realize that I needed to change careers or become more involved in administration of occupational therapy, I returned to Santa Rosa Junior College for human advocacy and business courses in the Spring semester of 2016.   I had wanted to enroll in Santa Rosa Junior College's paralegal program, but the college could not accommodate my disabilities with the program being on-campus, three evenings a week for three hours.

7.  During the spring semester of 2016, the advisors at Santa Rosa Junior College helped me set up going to Cerro Coso Community College's online paralegal program and also to have on-campus support through Santa Rosa Junior College with their paralegal program and disability resources department.   I also started taking some paralegal classes through Santa Rosa Junior College offered online or on weekends.

8.   I also started to receive vocational rehabilitation services through the CA Department of Rehabilitation.   My projected graduation date was May, 2018 and my job transition period was to start in June, 2018.

9. I graduated #1 in my paralegal class in May, 2018, with many awards and honors.   I graduated Phi Theta Kappa from Cerro Coso Community College and also have a 4.0 g.p.a. in my paralegal and business classes at Santa Rosa Junior College.

10.   Medically, in the summer of 2016, I unfortunately went through heat stroke.     This substantially changed my medical conditions, making me medically fragile. I developed additional medical conditions at that time, including lymphedema, heat intolerance, and the inability to sweat.

AMENDED COMPLAINT

11.    These conditions made it even more important to pursue a position that I would be able to continue to work in, which was the paralegal career.    In addition, medically, my symptoms from the cervical spinal stenosis increased during 2016 and 2017, to where I was having mild temporary episodes of paralysis and numbness of my hands that usually only lasted a few hours.      In the 2017, I had a MRI that showed my cervical spinal stenosis had increased to severe spinal cord compression.

12.   In the summer of 2018, there was a series of traumatic events, i.e. 5 vehicles on the freeway that caught a hill full of weeds on fire near our house.   Plus, I was threatened with arrest in June, after saying three sentences, and a week later being called "bat shit crazy".   This was only the start of activating my PTSD over the next few months.   I once again started to hold my muscles in the "fight" position, which exacerbated my spinal cord condition.   This time though, being much more medical fragile than before, I deteriorated to having paralysis of my hands and feet for weeks at a time, compared to previous episodes of this PTSD/Spinal Cord interaction.   I was pretty much bedridden for three months.     I stopped "speaking out" at the council meetings during this time to protect my health during these three months.   I also started physical therapy and have worked hard to regain my functional skills in the last year.

13.   In December 2019 and January 2020, I once again physically deteriorated and have lost motor skills because of the extreme stress of being cyberstalked by Christopher Kern Mora and the many posts by council member Mark Landman for seven weeks (which led to my misguided and desperate attempt for a gag order to this Court).

14.   I started holding my muscles in the PTSD "fight" position again, harming my spinal cord condition once again.   This required more medical intervention, i.e. new medications, and I am still recovering from this PTSD/spinal cord condition interaction at the time of this writing.

AMENDED COMPLAINT